**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SANA ENERGY MANAGEMENT, INC. et al.,

Plaintiffs,

v.                                              Case No. 19-11072

UNITED STATES OF AMERICA AND UNITED STATES
DEPARTMENT OF AGRICULTURE,

Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S[1] MOTION FOR SUMMARY
JUDGMENT, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Plaintiffs Fahd Ahmed and Hussein Ajami are former owners of Plaintiff Sana

Energy Management Inc. ("Sana"), which operated a retail gas station *cum* convenience

store located at 19202 Harper Avenue in Harper Woods, Michigan.

Defendant United States of America assessed against Sana a $44,000 civil

monetary transfer-of-ownership penalty for the transfer of Sana's business operations

contrary to federal regulations governing the Supplemental Nutrition Assistance

Program ("SNAP") administered by the Food and Nutrition Service ("FSN"). Sana had

been permanently disqualified from the SNAP program before the business was

_____

[1] Plaintiffs name the United States of America and the United States Department
of Agriculture as defendants in this case. Only the United States is a proper defendant.
7 U.S.C. § 2023(a)(13) ("If the store, concern, or State agency feels aggrieved by such
final determination, it may obtain judicial review thereof by filing a complaint against the
United States."). The court will refer to the United States as the sole defendant
throughout this opinion.

allegedly transferred. Plaintiffs now challenge the legitimacy of the assessment.

Discovery has concluded in the matter, and the parties have filed cross-motions for summary judgment on the question of whether Plaintiffs' long-term lease of physical assets to a third party, combined with the sale of inventory and other assets to the same, are sufficient to trigger the transfer-of-ownership penalty. Both motions have been fully briefed, and the court concludes that a hearing is not necessary. *See* E.D. Mich. LR 7.1(f)(2). For the reasons explained below, the court will grant Defendant's motion and will deny Plaintiffs' motion.

## II. BACKGROUND

Plaintiffs Ahmed and Ajami owned Plaintiff Sana corporation which operated a Citgo branded gas station and convenience store in Harper Woods, Michigan. (ECF No. 1-3, PageID.17.) Sana leased property from MY05, LLC. (*Id.*) MY05 is a separate legal entity also owned by Plaintiffs Ahmed and Ajami. (ECF No. 22, PageID.206.) Though MY05 is not a party to this suit, Plaintiff Ahmed served as the president of both Sana and MY05. (ECF No. 1-3, PageID.20.)

Sana first began operating the gas station and store in 1999 when Plaintiffs Ahmed and Ajami purchased "the business, which included goodwill and intangible assets[,]" for $325,000 while leasing the physical location from an independent third party. (ECF No. 22, PageID.218.) In 2004 Plaintiffs Ahmed and Ajami, through MY05, purchased the real property including the "canopy, underground storage tanks, equipment and other trade fixtures" located on the property for $243,000 and continued leasing it to Sana. (*Id.*)

During the time that Sana was authorized to accept SNAP benefits, Plaintiffs admit that one of the employees was engaged in SNAP trafficking (improper use of the benefits in various ways), although Plaintiffs claim they had no knowledge of this activity. (ECF No. 22, PageID.206-07.) In a letter dated September 14, 2017, the USDA required Sana to submit "sufficient evidence" to demonstrate that it had in place preventative measures to avert SNAP trafficking. (*Id.*) Sana failed to timely respond to the letter, alleging that the same employee responsible for the SNAP trafficking hid the letter from Plaintiffs. (*Id.*) Because Sana failed to timely respond, the USDA informed Plaintiffs, in a letter dated October 4, 2017, that Sana had been permanently disqualified from participation in SNAP. (*Id.*) The program includes provisions designed to prevent disqualified entities from eliding the disqualification such as by conducting sham transactions. In that vein, the letter informed Plaintiffs that "if the owners sold or transferred the store after its disqualification, it would be subject to and liable for a TOCMP [Transfer-of-Ownership Civil Money Penalty] as provided by SNAP regulation." (ECF No. 1-3, PageID.20.)

Plaintiffs' complaint alleged that Sana's business significantly decreased after its disqualification from SNAP forcing it to vacate the store (ECF No. 1, PageID.4), but Plaintiff Ahmed testified that the disqualification was a "contributing factor," not a "big factor" in the decision to wind down Sana's operation. (ECF No. 24-2, PageID.297.) Instead, he cited a lack of attention given to the business by the co-owners and increased nearby competition as factors in the businesses' general decline in sales. (*Id.*)

Ahmed testified that there was some disagreement between the two partners on whether they should shut down the business. (*Id.,* PageID.314.) In order to force the issue and begin unwinding the lease agreement, as president of MY05, Ahmed sent a series of three letters beginning in November 2017 advising Sana that it was behind on its rent. (ECF No. 24-8, PageID.351.) Ahmed testified that he eventually convinced co-Plaintiff Ajami that they should lease the location to an outside operator. (ECF No. 24-2, PageID.315-316.) In order to facilitate such a transaction, MY05 and Sana "reached" an agreement where Sana would leave behind its remaining inventory in lieu of back rent it owed MY05. (ECF No. 22-3; PageID.229.) Because the gas station was "in a very high-crime neighborhood," Plaintiffs decided they could not just shut the business down while they waited to find a buyer and risk that the building would be vandalized or looted. (ECF No. 24-2, PageID.312.) So, Sana kept operating until a new tenant, Wolverine Food & Fuel Inc. ("Wolverine") was found in the spring of 2018. (*Id.,* PageID.288.)

Wolverine agreed to a 10-year lease for the property and also purchased from Plaintiffs "[a]ll inventory and other personal property" at the store's location. (ECF No. 12-6, PageID.94.) The lease requires Wolverine to pay MY 05 $7,694 per month in "base rent" for the first five years of the agreement and $8,500 per month for the last five years. (ECF No. 24-13, PageID.413.) The agreement also requires Wolverine to pay "additional rent" each month to reimburse MY 05 for the cost of insurance. (*Id.,* PageID.416.) Though a separate "bill of sale" executed at the same time, Wolverine also purchased for $32,000 all the station's current inventory with "a retail value of over $50,000" as well as undefined "other personal property." (*Id.*, PageID.421; ECF No. 24-

2, PageID.317; ECF No. 16, PageID.427.) Wolverine's owner testified that "other personal property" included the business computer as well as some office furniture. (ECF No. 24-12, PageID.407.)

While Plaintiffs contend that the inventory purchased by Wolverine was only a fraction of the $130,000 in inventory that Sana "on average" maintained at the property (ECF No. 22-2; PageID.219.), Sana kept purchasing at least some inventory leading up to the transfer, and it is undisputed that the store was turned over with enough inventory to operate. (*See Id.,* PageID.292; ECF No. 24-12, PageID.397.) On the day Wolverine's owner came to take over the store, "it was running," and Wolverine shut the store down for a single day to do inventory and clean the store before reopening. (*Id.,* PageID.397.)

In his deposition, the owner of Wolverine testified that when he took over the location, all the equipment he needed to operate, including gas pumps, point-of-sale-systems, freezers, slushy machine, an office computer, surveillance system, lotto machine, and coffee machine were handed over to Wolverine as part of the lease. (ECF No. 24-12, PageID.401-02 ("Yes, everything was there. I didn't buy anything").)

After the transition, Wolverine signed a new contract with the same fuel supplier. (ECF No. 24-2, PageID.291; ECF No. 24-12, PageID.409.) The appearance of the gas station and convenience store did not change when Wolverine took over as the Citgo branded signage was owned by the fuel supplier. (ECF No. 24-4, PageID.327-28; ECF No. 24-12, PageID.398.) And, Wolverine continued to rely on many of the same wholesale suppliers—sometimes paying invoices that still listed Sana as the purchaser. (ECF No. 24-12, PageID.409-10.)

The FNS subsequently assessed Plaintiffs a civil monetary transfer-of-ownership penalty in the amount of $44,000. Plaintiffs timely sought administrative review of this penalty and argued that the sale of its inventory did not amount to the sale of the business. The FNS rejected this argument. In a Final Agency Decision, the FNS determined that the sale of Sana's inventory and leasing of the store premises to Wolverine amounted to a sale of the business for which a transfer-of-ownership penalty was properly assessed. The Final Agency Decision explained that "when MY05, LLC terminated the lease of [Sana] it was little more than a paper transaction and Fahd Ahmed and Hussein Ajami appear to have maintained an ownership interest in the business." (ECF No. 1-3, PageID.20.) Accordingly, the FNS upheld the $44,000 civil monetary transfer-of-ownership penalty against Plaintiffs pursuant to 7 C.F.R. § 278.6(f)(2)–(3).

Presently at issue is Plaintiffs' count requesting review of a final agency decision. (ECF No. 1, PageID.6.) Defendant previously sought to dismiss this count, arguing that by both selling the store's inventory to Wolverine and entering a long-term lease for the property that Plaintiffs effectively transferred the business and therefore should be forced to pay the penalty. (*See* ECF No. 16.)

Reviewing the precedent cited by opposing parties, the court concluded that based on the allegations in the complaint it could not, as a matter of law determine that the sale of inventory to the same, independent party who leased a store's former location was "dispositive on the question of transfer" and therefore the court declined to grant Defendant's motion to dismiss the count. (*Id.*, PageID.137.) The court noted that

6

while "Plaintiffs have stated a claim for relief that is plausible on its face" the complexion of the case may change "with the presentation of additional evidence at the summary judgment stage." (*Id.,* PageID.139.) And the court highlighted the possibility that it could be revealed through discovery that Sana's "business was comprised of more assets than simply a portion of its inventory, such as equipment, accounts receivable, cash, goodwill, and vendor contracts." (*Id.*)

### III. STANDARD

### A. Summary Judgment

Summary judgment is appropriate when there exists no dispute of material fact and the moving party demonstrates entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court considers all evidence, and all reasonable inferences flowing therefrom, in the light most favorable to the nonmoving party. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). The court may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment, only the finder of fact can make such determinations. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

The movant has the initial burden of showing—pointing out—the absence of a genuine dispute as to any material fact; i.e., "an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The burden then shifts to the nonmoving party to set forth enough admissible evidence to raise a genuine issue of material fact for trial. *Laster*, 746 F.3d at 726 (citing *Celotex*

*Corp.*, 477 U.S. at 324). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim "and would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013).

### B. SNAP

"Cases arising under the Food Stamp Act, 7 U.S.C. §§ 2011 *et seq*., may be resolved in the district court by summary judgment where there are no genuine issues of material fact." *Cullen Drive–In Grocery v. Block*, 778 F.2d 1141, 1142 (5th Cir.1985) (citations omitted). A Final Agency Decision issued by FNS is subject to judicial review. 7 U.S.C. § 2023(a)(13). The suit "shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue[.]" 7 U.S.C. § 2023(a)(15); *Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir.1993). In conducting this review, "[a] district court is to make its own findings based upon the preponderance of the evidence and not limit itself to matters considered in the administrative proceeding." *Warren v. U.S.*, 932 F.2d 582, 586 (6th Cir.1991). But courts have rejected the notion "that de novo review under § 2023(a)(15) requires that a district court proceed as if no agency action had been taken." *Moksin v. U.S. Dep't of Agric., Food & Nutrition Serv.*, No. 1:12-CV-597, 2013 WL 5923257, at *7 (S.D. Ohio Nov. 4, 2013) (citing *Redmond v. United States*, 507 F.2d 1007, 1011 (5th Cir.1975)) (quotations

omitted.) "Rather, while the district court is not 'bound by the administrative record,' the agency's decision is presumed to be valid and must stand 'unless the plaintiff proves that it should be set aside.'" *Id.* (quoting *Redmond*, 507 F.2d at 1011-12).

"The burden of proof in the judicial review proceeding is upon the aggrieved store to establish the invalidity of the administrative action by a preponderance of the evidence." *Id.* (citing *Goodman v. United States*, 518 F.2d 505, 507 (5th Cir.1975)). "Juxtaposing this substantive standard with ordinary summary judgment principles, [p]laintiff may withstand [d]efendant's motion by 'rais[ing] material issues of fact as to each of the violations charged against' the [plaintiff]." *Hanna v. United States*, No. 04–74627, 2007 WL 1016988, at *4 (E.D. Mich. Mar. 30, 2007) (citing *Kahin v. United States*, 101 F.Supp.2d 1299, 1303 (S.D.Cal.2000)); s*ee also Moksin*, 2013 WL 5923257, at *7 (applying the summary judgment standard to a transfer-of-ownership determination).

## IV. DISCUSSION

The FNS is required to assess a civil monetary penalty against the owner of a business that is sold or transferred after it has been disqualified from SNAP:

> In the event any retail food store or wholesale food concern which has been disqualified is sold or the ownership thereof is otherwise transferred to a purchaser or transferee, the person or other legal entity who sells or otherwise transfers ownership of the retail food store or wholesale food concern shall be subjected to and liable for a civil money penalty. . . . The disqualification shall continue in effect at the disqualified location for the person or other legal entity who transfers ownership of the retail food store or wholesale food concern notwithstanding the imposition of a civil money penalty under this paragraph.

7 U.S.C. § 2021(e)(1); 7 C.F.R. § 278.6(f).

Plaintiffs argue that the long-term lease agreement and bill of sale together cannot be viewed as the transfer of a business under the regulation because all that was actually sold to Wolverine was a small amount of inventory and personal property for $32,000. (ECF No. 22, PageID.211; ECF No. 25, PageID.452-53, 457.) Instead, a *bona fide* sale or transfer of a store would comprise a number of different asset classes including personal property, inventory, intangible property, cash or deposits, and goodwill. (*Id.*) And Plaintiffs reason that merely leasing real property and fixtures needed to run the business does not constitute a transfer or sale because it "all remains the property of MY05." (ECF No. 25, PageID.457.) Further, Plaintiffs argue that the lack of compensation for "business or goodwill" is "most damaging" to Defendants contention that Sana's business was in fact transferred to Wolverine. (*Id.*)

In support of their position, Plaintiffs rely principally on *Huggins v. United States*, 858 F.Supp.2d 694, 705 (N.D. Miss. 2012) (finding that no transfer of ownership had occurred where various documents indicated the plaintiff had dissolved his business before leasing a vacant grocery store to a family member).

Defendant responds by arguing that *Huggins*, and a similar case *Moksin v. U.S. Dep't of Agric., et. al.*, stand only for the proposition that "the transfer of an empty building does not give rise to [a] transfer-of-ownership money penalty." (ECF No. 24, PageID.268 (citing No. 1:12-CV-597, 2013 WL 5923257, at *1 (S.D. Ohio Nov. 4, 2013)).) And Defendant argues that "a penalty is proper" when "assets of a business in addition to an empty building are transferred." (*Id.*) In contrast to Plaintiffs' factual claims—contending only a very limited amount of assets were transferred—Defendant

argues that discovery has shown that "at least seven categories of business assets were transferred from Sana Energy, by or through MY05, to Wolverine: (1) possession of the land and the building housing the minimart; (2) inventory; (3) fixtures; (4) furniture; (5) equipment and machines; (6) goodwill; and (7) vendor contracts." (*Id.*, PageID.269.)

While the court declines to adopt a broad categorical rule, reviewing the factual record, the court agrees that the number and type of assets that were effectively transferred to Wolverine are far more significant than acknowledged in Plaintiffs' briefing. After examining the type and value of assets transferred, the court concludes that no reasonable factfinder could find that the bill of sale combined with the ten-year lease of other assets to Wolverine fails to constitute a transfer of ownership.

As the court has previously observed, the purpose of the transfer-of-ownership penalty is "to preserve the integrity of the food stamp program by deterring Program abuses by stores." *Anton v. United States*, 225 F. Supp. 2d 770, 778 (E.D. Mich. 2002) (Gadola, J.) (internal quotation marks and brackets omitted). The statute specifies that the civil penalty applies whenever a food store "is sold or the ownership thereof is otherwise transferred." 7 U.S.C. § 2021(e)(1). The statute, however, does not specifically define what constitutes a sale or *transfer* of ownership. The broad dictionary definition of "transfer" combined with the use of the conjunction "or" and the adverb "otherwise" makes clear that the penalty can properly apply to *de facto* transfers of ownership other than a plain-vanilla, outright "sale." *See* TRANSFER, Black's Law Dictionary (11th ed. 2019) ("Any mode of disposing of or parting with an asset or an interest in an asset, including a gift, the payment of money, release, lease, or creation of

11

a lien or other encumbrance.").

A review of the relatively sparse case law on the topic shows how other courts have attempted to differentiate between a mere liquidation of business assets and the sale of an ongoing business subject to a transfer-of-ownership penalty. Courts have sometimes found it relatively easy to ratify the assessment of such a penalty. *See, e.g., Saleh v. U.S., Dep't of Agric. Food & Nutrition Servs.,* No. 13-CV-4095, 2014 WL 4905456, at *5 (E.D.N.Y. Sept. 30, 2014) (holding that "documentation overwhelmingly supports the contention that the business was. . . transferred where a deli was sold pursuant to a "signed and notarized bill of sale for the Deli, including the Deli's inventory, machines, fixtures, furniture, and goodwill, and including a covenant not to compete"); *Thakor v. United States*, 55 F. Supp. 2d 1103, 1106, 1111 (D. Nev. 1999) (finding the transfer-of-ownership penalty applied where the former owners of a grocery store signed a contract with a third party, transferring "all property, materials, supplies, merchandise, equipment, [and] other inventory of the [store], along with the name, goodwill, tenant improvements and a covenant not to compete" for $30,000) (internal quotations omitted).

In other instances, courts have declined to grant summary judgment for a defendant when plaintiffs present at least some credible evidence that their previous business was discontinued and that only physical assets were sold to a third-party buyer. As noted above, in *Huggins* the district court concluded that the "leasing of [plaintiff's] own empty building that had previously housed his grocery store business to his relative did not, in and of itself, constitute a 'transfer' under the statute." *Id.* at 705. In

12

support of its decision to deny defendant's motion for summary judgment, the court cited the fact that (1) the store "stood vacant for some time before the Plaintiff leased the building to his relative," (2) that the original owner had sold all inventory before closing its operation, and (3) that plaintiff followed "IRS guidelines for dissolving a business." *Id.* at 701. *See also Moksin*, 2013 WL 5923257, at *9 (denying summary judgment where plaintiffs submitted an affidavit from the purported buyer certifying that she only leased space and had not purchased the inventory, fixtures, or goodwill from the previous owners).

The fact patterns in other cases fall somewhere in-between. For instance, in *Estremera v. United States* the evidence regarding the sale of a disqualified grocery store was less clear. *Estremera v. United States*, 442 F.3d 580 (7th Cir. 2006). Plaintiff in *Estremera* signed "a bill of sale for the store, a real estate closing statement confirming the sale to [a third-party buyer], and an affidavit attesting to the sale of the store" for $44,000 plus "5% interest per year on the unpaid balance." *Id.* at 582. The sale also contained a large "'lease'" component whereby the buyer agreed to pay $4,500 per month for five years. *Id.* The Seventh Circuit, however, rejected plaintiff's argument that the complex nature of the transaction meant that ownership of the business would not actually transfer to the buyer until it had "paid the $44,000 remaining on the mortgage note." *Id.* at 583. After examining the available documentation holistically, the court found "[a]ll of the documents offered by the parties, including the bill of sale, consent action agreement, [and] real estate closing statement . . . demonstrate that there was a sale." *Id.* at 584.

13

Because uncontested evidence here shows that Plaintiffs transferred a fully-operational gas station and convenience store business to Wolverine and included *all* physical assets necessary to operate the business—along with at least a modicum of goodwill—the court finds the present scenario to be much closer to the facts of *Saleh* and *Estremera* then *Huggins* or *Moksin*. Wolverine's owner testified unequivocally that both the store and gas station were running on the day he came to take over the business and that everything he needed both in the way of equipment and merchandise—including perishable items like milk and gas—were present in sufficient quantities to operate the business.[2] (ECF No. 24-12, PageID.397.) Wolverine continued many of Sana's existing relationships with the store's suppliers and even paid some invoices that still listed Sana as the customer. (*Id.*, PageID.409-10.) Wolverine's owner even testified that he continued to use the same furniture purchased from Sana and ran the entire business on the same computer system he purchased as part of the agreement. (*Id.,* PageID.408.)

From the perspective of a retail customer, nothing at the store had changed after Wolverine took over. The receipts continued to be labeled as "Harper Woods Citgo" and, likely due to the requirements of the continuing franchise agreement with Citgo, none of the signage or branding was changed. (ECF No. 24-2, PageID.290, 295.) And after taking over the store, Wolverine conducted no advertising because "[t]here was no need for it." (*Id.* PageID.412.)

---

[2]     Plaintiffs' intentions while they continued to operate the property are irrelevant to the question of whether such actions helped preserve the value of intangible assets such as customer relationships.

Plaintiffs response briefs point out that some of the equipment needed for the station to operate was never owned by Sana in the first place, such as the signage, lottery machines, and gas pumps.[3]  (ECF No. 25, PageID.456-57; ECF No. 24-2, PageID.297.) Plaintiffs advance this fact to bolster the contention that the assets sold to Plaintiff did not constitute an entire business. But in many respects, such an observation strengthens Defendant's argument. It both explains why such assets were not explicitly included in the bill of sale—because they were never owned by Plaintiffs—and this information also demonstrates how it is routine for this type of business to operate while owning few physical assets. *See e.g., Republic Franklin Ins. Co. v. Brethren Mut. Ins. Co.,* 824 F. App'x 132, 133 (3d Cir. 2020) (a dispute concerning a gas station and convenience store that was operating in leased space); *Covington Specialty Ins. Co. v. U.S. Venture, Inc.*, No. 20 C 6177, 2021 WL 1428474, at *1 (N.D. Ill. Apr. 15, 2021) (same).

Plaintiffs additionally argue that a transfer of ownership never occurred because other fixtures needed to operate the business, including the "canopy, islands, underground storage tanks. . . [and] any fixtures that may be located in the store" were not transferred to Wolverine. (*Id.,* PageID.456-57.) The court fails to see how the decision to lease, as opposed to an outright sale, of durable physical assets should be

---

3       The court notes that there appears to be a conflict between Plaintiffs' briefing and Plaintiff Ahmed's testimony regarding the ownership of the station's gas pumps. While both the lease agreement and Plaintiffs' brief state that the pumps were owned by MY 05 (*see* ECF No. 25, PageID.456; ECF No. 24-13, PageID.413.), Plaintiff Ahmed testified repeatedly in his deposition that the gas pumps were in fact owned by Citgo or the fuel supplier, (*see* ECF No. 24-2, PageID.297).

dispositive on the question of transfer. It is quite common for retail food operations to operate in leased real estate. And, for approximately the first five years of its business, Plaintiff Sana itself operated while leasing the land and buildings from an unrelated third party. (*See* ECF No. 22-2, PageID.218 (noting that Plaintiffs Ahmed and Ajami did not purchase the real estate from Shell Oil until November 2004).)

While at least some testimony suggests that all other fixtures and equipment not expressly included in the bill of sale were merely leased to Wolverine, the court finds that such a distinction does not help Plaintiffs. As Defendant points out, many of the leased fixtures and equipment "such as the coffee machines, slushy machines, point-of-sale terminals" and security system all likely have a remaining useful life of fewer than ten years. (ECF No. 26, PageID.469.) The court thus finds that Wolverine effectively acquired such equipment. (*See Id.*) *See also* 26 U.S.C. § 179; 26 U.S.C. § 168 (allowing for depreciation of most personal property for "use in the active conduct of a trade or business" over seven years for tax purposes). The court views the *de facto* transfer of such physical assets through a ten-year lease agreement as the very type of situation anticipated by the governing statute which applies whether a business is "sold or the ownership thereof is *otherwise transferred*." 7 U.S.C. § 2021(e)(1). The court finds as a matter of law that this long-term lease of equipment, exceeding that property's expected useful life, to be merely a means of "otherwise transferr[ing]" property without an outright sale. This is the very type of transfer that Congress clearly prevented in crafting such a broad statutory *otherwise* provision. *See id.*

Finally, Plaintiffs cite the fact that neither the bill of sale nor the lease agreement

16

contained an explicit transfer of goodwill to Wolverine. (*See* ECF No. 25, PageID.457 ("most damaging to Defendant[']s[] argument, Sana Energy received no compensation for its business or goodwill"). Precedent, however, suggests that goodwill can implicitly be included in the sale of a business even when not expressly mentioned in the contract. *See In re Spradlin,* 284 B.R. 830, 836 (E.D. Mich. 2002) (Cohn, J.) (finding that "although the parties did not explicitly state that the goodwill of [a business] was also being transferred" some amount of goodwill "was at least implicit[ly]. . . transfer[ed]" despite a witness's testimony to the contrary.) As anyone who has ever carefully read a balance sheet or taken a basic accounting course knows, "goodwill" is merely a way of accounting for the extra value of a company beyond the liquidation value of its total assets. 38 Am. Jur. 2d Good Will § 2 ("Good will is the value of a business or practice that exceeds the combined value of the physical assets or property or of the net assets used in the business."); GOODWILL, Black's Law Dictionary (11th ed. 2019) ("A business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets.") Under this definition, it is apparent that any active business that sells for more than the liquidation value of its assets implicitly includes some amount of goodwill in the transaction.

The evidence presented in the summary judgment motions invariably leads to the conclusion that at least some amount of goodwill was implicitly transferred. Plaintiffs' affidavits indicate that in 1999 Plaintiffs Ahmed and Ajami purchased "the business,

which included goodwill and intangible assets" for $325,000 [approximately $490,000 in 2018 dollars], and it leased the physical location from an independent third party. (ECF No. 22, PageID.218.) In 2004, Plaintiffs later purchased the real property on which the business operated including the "canopy, underground storage tanks, equipment and other trade fixtures" located on the property for only $243,000 [approximately $323,000 in 2018 dollars].[4] (*Id.*)

Under the terms of the ten-year lease agreement, Wolverine is allegedly paying almost one million dollars total in base rent to utilize—yet to gain no ownership interest in—essentially the same assets that Plaintiffs wholly acquired in 2004 for $243,000. (*See* ECF No. 24-13, PageID.413-22 (lease agreement setting "base rent" at $7,694.00/month for the first five years and $8,500/month for the remainder of the ten-year lease).) When combined with the fact that the business was operating at the time of the transfer, it becomes clear that paying such an substantial premium to "rent" a gas station property in what Plaintiffs describe as "a very high-crime neighborhood" for a business with declining sales and increasing competition makes sense only if some amount of goodwill, not explicitly listed in the lease agreement, was also transferred,

---

[4]      While the record does not indicate how the lease rate was determined, the court would expect that the agreed-upon lease rate to be a function of the gas station's expected income based on historical sales. Even if such a method were used, when the business has the "ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets"—as appears to be the case here—goodwill is transferred. GOODWILL, Black's Law Dictionary (11th ed. 2019).

thereby ensuring the buyer a recognizable return on their investment.[5] (*See* ECF No. 24-2, PageID.297, 312.)

In sum, the court finds that undisputed evidence shows that the long-term lease agreement combined with the bill of sale effectively transferred Sana's active business to Wolverine. Considered together, the contracts either gave Wolverine use of, or effectively transferred, all land, fixtures, and equipment needed to hit the ground running, and carry on managing the still-operating business. Through the bill of sale, Wolverine purchased sufficient inventory and furniture to continue to operate the business. The lease's financial terms lead to the undeniable conclusion that some amount of goodwill was transferred through the store's continued operation. And Wolverine was able to leverage existing contractual relationships to continue to supply the store after the sale. Adding this evidence together, it is apparent that Plaintiffs effectively transferred a going concern—a fully functional, operating business—to a single buyer; this transaction was not merely a liquidation of a former business's assets.

---

[5]      Property tax records present further support for the conclusion that the value of the real property leased to Wolverine has not changed significantly since MY05 acquired it in 2004. According to the City of Harper Woods, the property currently has an assessed value of $113,200. *See 19202 Harper Ave*, City of Harper Woods, https://bsaonline.com/SiteSearch/SiteSearchDetails?PaymentSearchCategory=Parcel+Number&PaymentApplicationType=Tax&PaymentSearchText=42+004+02+0451+001&uid=679&ReferenceKey=42+004+02+0451+001&ReferenceType=0&RecordKey=42+004+02+0451+001&RecordKeyType=0&SearchOrigin=3&SearchCategory=Parcel+Number&SearchText=42+004+02+0451+001 (lasted visited May 14, 2021). In Michigan, the assessed value for property tax purposes is capped at a maximum of 50-percent of "true crash value." While such records are certainly not definitive, this valuation suggests that the property's market value remains somewhere closer to $230,000. MI Const. Art. 9, § 3. *See also President Inn Properties, LLC v. City of Grand Rapids*, 291 Mich. App. 625, 637, 806 N.W.2d 342, 350 (2011) ("Michigan courts have considered 'true cash value' as being synonymous with 'fair market value.'").

**V. CONCLUSION**

Plaintiffs' sole claim, presently at issue, seeks review of the FNS finding that Plaintiffs had effectively sold or otherwise transferred their gas station and convenience store business to Wolverine and therefore should be subject to a $44,000 transfer-of-ownership penalty. (ECF No. 1, PageID.6.) After reviewing the record, the court finds that undisputed evidence supports the FNS's finding that a transfer of ownership of an ongoing food business occurred. The Plaintiffs' arguments do no more than minimize the nature of the transfer; they do not, as a matter of law on the evidence presented, succeed in negating the agency's determination. No reasonable factfinder could find otherwise, and the assessment of a penalty under 7 U.S.C. § 2021(e) is appropriate. Given this finding, the court grants summary judgment in favor of Defendant on the sole count currently at issue and denies Plaintiffs' cross-motion for summary judgment. Accordingly,

IT IS ORDERED that Defendant's motion for summary judgment (ECF No. 24) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' motions for summary judgment (ECF Nos. 21, 22) are DENIED.

Inasmuch as all claims have not been resolved, the court will issue a separate judgment in favor of Defendants.

s/Robert H. Cleland               /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  May 26, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 26, 2021, by electronic and/or ordinary mail.

s/Lisa Wagner_____/
Case Manager and Deputy Clerk
(810) 292-6522
